IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SAID TLEMCANI, | : | CIVIL ACTION NO. |
| | : | 1:17-CV-2547-TWT-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| GEORGIA DEPARTMENT OF | : | **FINAL REPORT AND** |
| COMMUNITY HEALTH, | : | **RECOMMENDATION ON A** |
| | : | **MOTION FOR SUMMARY** |
| Defendant. | : | **JUDGMENT** |

Plaintiff Said Tlemcani originally filed the above-captioned action on March 2, 2017 in the Superior Court of Fulton County. On July 6, 2017, Defendant Georgia Department of Community Health ("Defendant" or "DCH") removed the action to this Court. Plaintiff claims that Defendant discriminated against him on the basis of his race, religion, and national origin, and retaliated against him, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").[1] This action is now before the Court on Defendant's Motion for Summary Judgment [27]. For the reasons discussed below, the Court **RECOMMENDS** that the Motion for Summary Judgment [27] be **GRANTED**.

---

[1] Plaintiff originally asserted an additional claim under the Georgia Whistleblower Act, O.C.G.A § 45-1-4, but that claim has been dismissed. *See* Order [32].

## I.   FACTS

Unless otherwise indicated, the Court draws the following facts from "Defendant's Statement of Material Facts as to Which There Is No Genuine Issue to be Tried" [27-2] ("Def. SMF"), "Plaintiff's Response to Defendant's Statement of Material Facts" [29-1 at 1–11] ("Pl. Resp. SMF"), "Plaintiff's Statement of Additional Undisputed Material Facts" [29-1 at 11–13] ("Pl. SMF"), and Defendant's "Reply to Plaintiff's Statement of Additional Undisputed Material Facts" [31] ("Def. Resp. SMF").

For those facts submitted by Defendant that are supported by citations to record evidence, and that the Plaintiff has not specifically disputed and refuted with citations to admissible record evidence showing a genuine dispute of fact, the Court deems those facts admitted, pursuant to Local Rule 56.1B. *See* LR 56.1B(2)(a)(2), NDGa ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B(1).").

The Court has excluded assertions of fact by either party that are immaterial or presented as arguments or legal conclusions, and has excluded assertions of fact unsupported by a citation to admissible evidence in the record, or asserted only in the party's brief and not the statement of facts. *See* LR 56.1B, NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."). The Court has also viewed all evidence and factual inferences in the light most favorable to Plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

Both parties have objected to some of the opposing party's proffered facts on the ground that an asserted fact is not relevant or material to the claims and defenses presented in this case. The Court nevertheless includes some of those facts because they provide background information that is helpful to explain the context of the parties' asserted facts and contentions. The parties also attempt to dispute some of the opposing party's proffered facts on the grounds that the facts are not supported by the evidence, but many of these objections are over matters that are not necessarily material to the disposition of this case. Accordingly, the Court will not

rule on each and every objection or dispute presented by the parties, and will discuss those objections and disputes in the analysis section only when necessary to do so regarding a genuine dispute of a material issue of fact.

Plaintiff is an Arab-Moorish, Muslim male of Moroccan descent. Def. SMF ¶ 1. Plaintiff worked at DCH from April 13, 2009 until his termination on February 29, 2016. *Id.* His most recent position was Director of Benefits Recovery, a unit within DCH's Financial Management Division. *Id.* Plaintiff's department collected overpayments under Medicaid and Peachcare. Pl. SMF ¶ 10. Plaintiff became Director of Benefits Recovery in 2013, and was initially supervised by former Chief Financial Officer ("CFO") Vince Harris. Def. SMF ¶ 5. Harris's successor was Tim Connell, who served as CFO until July 2015. Def. SMF ¶¶ 3, 7. The next CFO of DCH was Elizabeth Brady, who served in that capacity from July 2015 to December 2016. Def. SMF ¶ 3. The CFO reported directly to the Commissioner of DCH. *See id.* Clyde Reese[2] served as DCH Commissioner from July 1, 2013 until November 30, 2016. Def. SMF ¶ 2. Plaintiff's immediate supervisor was Angela Newell, who served as Deputy CFO from August 2015 to late 2016 or early 2017, and who reported directly to CFO Brady. Def. SMF ¶ 4.

---

[2] Former Commissioner Reese is now a judge on the Georgia Court of Appeals. *See* Reese Aff. [27-7] ¶ 2.

Plaintiff alleges that then-CFO Harris promised Plaintiff a substantial salary increase if Plaintiff performed well in his new position as Director of Benefits Recovery. *See* Def. SMF ¶ 6. Plaintiff requested a salary increase from Harris's successor, Connell, but did not receive one. Def. SMF ¶ 7. Plaintiff filed an internal complaint in June 2015 alleging that the denial of his requests for a salary increase was discriminatory on the basis of his race. Def. SMF ¶ 8. This complaint was investigated by DCH's Office of Inspector General ("OIG"). *Id.* The OIG concluded in a report dated July 27, 2015 that there was no evidence to support Plaintiff's allegation of racial discrimination. Def. SMF ¶ 9.

Plaintiff does not dispute this fact but states that it is "subject to clarification." Pl. Resp. SMF ¶ 9. Plaintiff states that the OIG report found "that Plaintiff was paid less than comparators" because Plaintiff was a grade 19 employee paid at $70,000 per year while six other OFM employees designated as MG1 Business Ops, ranging from grades 17–19, were paid $71,000 to $100,000 per year. *See id.*; Pl. SMF ¶ 1. Defendant objects that the cited evidence does not establish that Plaintiff was "underpaid" or that these unnamed individuals were "comparators," as there is no discussion of the individuals' qualifications, years of experience, or actual job positions, and that this fact is immaterial. Def. Resp. SMF ¶ 1. The cited source does state that Plaintiff had the same designation of MG1 Business Ops as the other six

OFM employees, *see* Def. Ex. 1, Tlemcani Dep. Ex. 5 [27-4 at 227], but there are no facts stated about these employees' job titles, qualifications, or years of experience.

Within a short period—either within two weeks or two months—after Brady became CFO, Plaintiff requested a meeting with her in which he asked for a salary increase and informed Brady that Harris had promised him a raise. Def. SMF ¶ 11; Pl. Resp. SMF ¶ 11. Plaintiff also told Brady that his unit was understaffed, causing him to work excessive hours, and that he needed more employees to effectively manage the Benefits Recovery unit. Def. SMF ¶ 12. Brady committed to developing a staffing plan to increase the number of employees in Plaintiff's unit. Def. SMF ¶ 13. Brady also informed Plaintiff that she would not give him a raise at that time because she was new in her role and needed more direct experience with him and the unit to make this decision. *Id.* Brady contacted Harris to ask Harris if he had promised Plaintiff a pay raise, and Harris said he had not promised anything to Plaintiff but had informed Plaintiff he would revisit the issue after a year. Def. SMF ¶ 14.[3]

---

[3] The Court overrules Plaintiff's hearsay objection to this fact. *See* Pl. Resp. SMF ¶ 14. Defendant states that this statement is offered not for the truth of the matter asserted (*i.e.*, that Harris had not promised a raise to Plaintiff), but to show Brady's non-discriminatory mental state. Def. Reply Br. [30] at 2; *see Richards v. Wells Real Estate Funds, Inc.*, No. 07-12292, 2007 WL 3002071, at *1 (11th Cir. Oct. 16, 2007) (slip op.) ("It is well-established in the Eleventh Circuit that the hearsay rule does

Shortly after that meeting, Brady and the Deputy CFO, Newell, met with Plaintiff to discuss a staffing plan; Plaintiff informed them that he needed eight people including himself to adequately manage his unit. Def. SMF ¶ 15. According to Defendant, when Brady first became CFO there were only four employees in Plaintiff's unit including Plaintiff, and by the time of Plaintiff's termination there were seven, with an eighth position awaiting final approval to hire a selected candidate. Def. SMF ¶ 17. Plaintiff purports to dispute that fact, stating that only one additional employee was ever added, and this additional employee lasted only a month before leaving. Pl. Resp. SMF ¶ 17; *see* Tlemcani Dep. [27-4] 64:23–66:6.[4]

Over the next few months, Plaintiff continued to raise concerns about his salary and staffing to Brady. Def. SMF ¶ 18. Brady responded with the same answer each time, and found this "frustrating" because she and Plaintiff were having repetitive conversations after she had already given Plaintiff her answers. *Id.* Brady had weekly meetings with her "direct reports" (presumably meaning the employees who reported directly to her), including with Newell, the Deputy CFO. Def.

---

not apply to out-of-court statements that are offered as evidence of the decisionmaker's nondiscriminatory reasons for not hiring someone."). Based on the purpose for which Defendant offers it, the statement is not hearsay.

[4] Plaintiff's deposition testimony is somewhat unclear as to how many employees he contends were added while Brady was CFO, but the facts concerning the precise numbers of staff in Plaintiff's unit are ultimately not material.

SMF ¶ 19. Newell reported several times to Brady that she was having issues with Plaintiff because Plaintiff would argue with Newell and talk over her, did not listen, and became aggressive when she gave him direction or tried to correct his work product. *Id.*[5] Brady informed Commissioner Reese about the issues with Plaintiff, specifically reporting that Plaintiff would become aggressive, combative, and intimidating, most frequently with Newell, and that he would become agitated and belligerent if he felt rebuffed or criticized. Def. SMF ¶ 20.

On September 15, 2015, Plaintiff had a telephone call with Ann Burris, the director of Human Resources for DCH. Def. SMF ¶ 21. Burris served as Director of Human Resources from July 1, 2012 until February 15, 2016, and in that role was responsible for overseeing all aspects of human resources administration, including providing advice and/or approval on personnel matters, hiring, and compensation. Def. Ex. 5, Burris Aff. [27-8] ¶¶ 2–3. Specifically, all salary requests at DCH must be approved by Human Resources. Def. SMF ¶ 22. During her September 15, 2015 telephone call with Plaintiff, Burris informed Plaintiff that she did not approve of

---

[5] The Court overrules Plaintiff's hearsay objection to this fact, on the basis of Defendant's representation that this fact is stated for purposes of Brady's state of mind and not as proof that Plaintiff was in fact interacting with Newell in such a way. *See* Pl. Resp. SMF ¶ 19; Def. Reply Br. [30] at 2.

his proposed salary for a new hire in his unit because it was above the salary scale for the position. Def. SMF ¶ 21, 23.

The parties dispute what else happened during this call. Defendant states that Burris testified that Plaintiff began yelling and arguing with her about the salary, refused to listen to her, was dismissive of everything she said, and was aggressive in his delivery and tone. Def. SMF ¶ 24; Burris Aff. [27-8] ¶ 6. Plaintiff states that Burris's account is not true. Pl. Resp. SMF ¶ 24; Pl. Ex. 1 [29-2]; Tlemcani Dep. [27-4] 53:20–55:11. According to Plaintiff, Burris intentionally mispronounced his name. Pl. SMF ¶ 2.[6] Plaintiff also testified in his deposition that it was Burris who was yelling. *See* Tlemcani Dep. 55:10–11.

It is undisputed, however, that following the phone call between Plaintiff and Burris, Plaintiff sent an email to Burris on which he copied Brady, Newell, DCH

---

[6] The Court overrules Defendant's objection that the cited testimony does not support this fact. Plaintiff testified that he informed Burris how to pronounce his first name and that Burris continued to pronounce it incorrectly. *See* Tlemcani Dep. 54:23–25.

The Court sustains, however, Defendant's objection to Plaintiff's statement that Newell mocked his name. *See* Pl. SMF ¶ 2; Def. Resp. SMF ¶ 2. Plaintiff cites a passage of his deposition in support of his statement that Newell mocked his name, but the cited passage does not discuss Newell at all. *See* Tlemcani Dep. 91–92. Indeed, the cited passage is Plaintiff's account of a conversation with Brady in which Brady, according to Plaintiff, repeated his first name several times but apparently pronounced it correctly. *Id.* at 91:7–15.

Inspector General Donald Pollard, and DCH General Counsel Marial Ellis. Def. SMF ¶ 25. In this email, Plaintiff accused Burris of intimidating him, stated that her phone call was "completely unethical and uncalled for," and stated that the salary had been discussed with Newell and "she [Newell] fully agreed." Def. SMF ¶ 26. Burris replied to Plaintiff's email, and in her reply, stated that she had already discussed her concerns with Brady and that "there are no further discussions warranted." Def. SMF ¶ 27. Plaintiff replied to that email and accused Burris of screaming at him; Plaintiff also wrote that Brady and Newell had already approved the salary. Def. SMF ¶ 28.

Burris was concerned with Plaintiff's emails, as she felt the emails were "unprofessional and aggressive," that they had made several untrue accusations against her and that colleagues were copied who had no need to be involved.[7] Def. SMF ¶ 29. Burris also felt that Plaintiff was accusing her of having not cleared her decision with him, when in fact Burris was in a senior position and had discretion to approve the salary. *Id.*

---

[7] Plaintiff states in response that it was not inappropriate to copy his "supervisory chain and those charged with investigating grievances and misconduct." Pl. Resp. SMF ¶ 29. This not a proper response under Local Rule 56.1B(2)(a)(2) to a summary judgment movant's facts because it is argumentative; it is also beside the point of the stated fact, which merely states what Burris's opinion was about the appropriateness of copying certain people in the email.

To that end, Burris informed Brady of her concerns about Plaintiff's emails and about Plaintiff's behavior during the phone call. Burris recommended that Brady address the situation because "I was not going to tolerate this kind of behavior – it was unacceptable." Def. SMF ¶ 30. Brady was also concerned and thought that Plaintiff's emails were "completely unprofessional" and "angry and accusatory." Def. SMF ¶ 31. Brady felt that Plaintiff had "chastised" Burris because Burris did not approve the salary he requested, and that Plaintiff had "lashed out" at Burris by accusing her of intimidation and inappropriate conduct. *Id.* Brady also thought it was inappropriate to copy the Inspector General and General Counsel, as the matter did not concern them, and that doing so reflected poorly on Plaintiff and their division. *Id.* Brady did not do any follow-up investigation, however. Pl. Resp. SMF ¶ 31. Plaintiff states that there were witnesses to the conversation, who presumably could have supported Plaintiff's account of whether he or Burris had been yelling. *See* Pl. Resp. SMF ¶ 32.

Brady had never seen Burris yell at a co-worker and did not believe that yelling at a co-worker was something Burris would do. Def. SMF ¶ 32. By contrast, Brady had personally heard Plaintiff raise his voice and talk over people, and had received reports about Plaintiff's loud and aggressive behavior from Newell and her

predecessor as CFO, Connell. [8] *Id.* Brady believed Burris based on her own experience with both Burris and Plaintiff; Brady also felt that Plaintiff was "in the wrong." *Id.* Brady met with Plaintiff and told him that his emails to Burris were unprofessional and needed to stop. Def. SMF ¶ 34. On September 17, 2015, Brady issued a Letter of Concern to Plaintiff that stated in part:

> You, [Newell,] and I met on the afternoon of September 15, 2015 in my office to discuss the email exchange between you and Ann Burris . . . . I explained to you that your response was unprofessional and is not expected to be repeated in the future. Please understand that outbursts such as these – whether written or verbal – will not be further tolerated.

Def. SMF ¶ 35. Brady also reiterated in this letter that she would not recommend a salary increase (for Plaintiff) based on commitments that may have been made by her predecessor, and that she was fully addressing Plaintiff's staffing requests. Def. SMF ¶ 36.

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on the basis of race, religion, national origin, and retaliation, on September 29, 2015. Def. SMF ¶ 37. Plaintiff's charge concerned

---

[8] As with Plaintiff's other hearsay objections discussed above, the Court overrules Plaintiff's hearsay objection to this fact because Defendant states that it offers this fact to show Brady's state of mind (*i.e.*, what she believed about Plaintiff), not for the truth of what Newell or Connell had reported to Brady. *See* Pl. Resp. SMF ¶ 32; Def. Reply Br. [30] at 2.

the denial of his requests for a salary increase and the September 17, 2015 Letter of Concern. *Id.* Plaintiff received a Notice of Right to Sue on or around March 14, 2016. Def. SMF ¶ 38.

On February 4, 2016, Plaintiff filed an internal grievance against Newell concerning a meeting that occurred February 3, 2016, during which Plaintiff and Newell discussed edits that Newell made to Plaintiff's Power Point presentation for an upcoming internal presentation. Def. SMF ¶ 39. Plaintiff stated in the grievance that his issues were: "Intimidation," "Unethical conduct," "Scorn and humiliation," "Denigration of BR duties and responsibilities – violation of fiscal policy," and "Capricious and uncontrolled temperament." Def. SMF ¶ 39. The parties partially dispute whether this grievance was "filed on the basis of discrimination." *See* Def. SMF ¶ 40. Defendant states that Plaintiff did not assert that Newell discriminated against Plaintiff "based on a protected characteristic." *Id.* Plaintiff states that while he "may have focused on issues within the ordinary purview of internal grievances," he "specifically noted that an EEOC charge was involved." Pl. Resp. SMF ¶ 40. A review of the document shows that it does not accuse Newell specifically of discrimination, but Plaintiff stated, "I currently have a claim with EEOC and I am waiting for an investigation to be launched for the intimidation,

racial and religious discrimination I have been subjected to." *See* Def. Ex. 1, Tlemcani Dep., Ex. 12 [27-4 at 242] (Plaintiff's February 4, 2016 DCH grievance).

Plaintiff had a second meeting with Newell about the edits that she made to his Power Point presentation, on February 4, 2016. Def. SMF ¶ 41. Newell had "crossed out" the majority of the nine slides Plaintiff had created for his presentation. Def. SMF ¶ 42. On one slide, Newell marked through Plaintiff's list of the employees in his unit and wrote "Org Chart." Def. SMF ¶ 43. Plaintiff was insulted by the corrections to the slides, because he believed Newell "didn't know anything about Benefits Recovery." Def. SMF ¶ 44. Plaintiff was also offended by Newell's edits because he thought she had "made a mockery of [his] slides." *Id.* Plaintiff told Newell, "I've been in this capacity for seven years, at least, if not with another five years prior to coming here, and I know if I put something on the slides, I'm fully qualified, because I've done this before." Def. SMF ¶ 45.

Brady was in her office and, according to Brady, could hear Plaintiff's "loud voice" and "yelling" coming from Newell's office next door. Def. SMF ¶ 46. Brady went to Newell's office and asked if everything was alright. *Id.* Newell told Brady that everything was okay, but Brady was not convinced. Def. SMF ¶ 47. Brady then took a walk around the floor before returning to her office. *Id.* When she returned, according to her, she could still hear Plaintiff yelling and found this to be disruptive.

*Id.* Brady joined the meeting again, and stated that the meeting needed to quiet down. Def. SMF ¶ 48. Brady observed that Plaintiff was "very upset" and agitated and was arguing with Newell about the edits she made to his Power Point slides. *Id.* The presentation was supposed to be a high-level overview of Plaintiff's unit and what it did—but in Brady's opinion, Plaintiff's slides had an unnecessary level of detail, so Brady suggested that Plaintiff look at another department's presentation. Def. SMF ¶ 51. Plaintiff then began talking about his concerns with staffing levels, to which Brady reminded him that there were seven employees in his unit with another in the approval process. Def. SMF ¶ 52. Brady testified that "[h]aving to discuss this with him yet again was frustrating. It seemed as though [Plaintiff] was determined to have a reason to argue, even after the issue of the Power Point slides was diffused." *Id.*

The parties dispute whether Plaintiff or Newell yelled during this February 4, 2016 meeting. According to Brady, Plaintiff "kept talking over Ms. Newell and was extremely loud," at one point arguing with Newell that he did not need her edits because he was an expert in the area of benefits recovery. Def. SMF ¶ 49. Brady was concerned with Plaintiff's behavior and attitude, which she characterized as "disruptive, insubordinate, argumentative, and difficult to manage." Def. SMF ¶ 50. Brady believed that Plaintiff should have been receptive to Newell's directions given

that she was his supervisor and that Plaintiff should have been able to discuss the contents of his slides like a professional. *Id.* According to Plaintiff, however, Newell was the one yelling, and not Plaintiff. Pl. Resp. SMF ¶¶ 46–50.

Brady decided to issue a Written Warning/Reprimand to Plaintiff regarding his behavior during the February 4, 2016, meeting, which, in her view, was becoming an "unacceptable pattern." Def. SMF ¶ 53. The February 11, 2016, Reprimand states that it is for a "Behavior/Conduct Infraction" and references Plaintiff's September 17, 2015 Letter of Concern. *Id.* In the Reprimand, Brady stated her concern that Plaintiff perceived any correction to his work product as a personal attack, which caused him to become agitated, loud, and seemingly unable to hear what was being communicated to him. Def. SMF ¶ 54. She further stated that Plaintiff's "deficiencies continue to be behavioral in nature" and that Plaintiff "does not take direction well." Def. SMF ¶ 55. The Reprimand noted that Plaintiff had engaged in insubordinate and bullying behavior, and that "we are in a cycle of repetitive discussions." *Id.*; *see also* Def. Ex. 3, Brady Aff., Ex. D [27-6 at 26]. The Reprimand directed Plaintiff not to be argumentative and insubordinate with management. *Id.*

On February 11, 2016, Brady and Newell met with Plaintiff to issue the Reprimand and discuss the reasons that they were doing so. Def. SMF ¶ 56. During

the meeting, Brady reviewed the points outlined in the Reprimand. *Id.* The parties agree that matters other than the reprimand were discussed, although they differ somewhat as to specifics. Defendant states that Plaintiff began talking about complaints about past supervisors. Def. SMF ¶ 57. Plaintiff states that he "brought up discrimination because Brady was intentionally mispronouncing [Plaintiff's] name." Pl. Resp. SMF ¶ 57.

According to Brady, at one point Plaintiff stated "I love DCH to death" and that he takes his job very seriously, and that if God were to find him lacking in this, or untruthful in this statement, he hoped he would receive his death at home today, or that his home would die today, or words to that effect.[9] Def. SMF ¶ 58. Plaintiff

---

[9] In her deposition, Brady gave the following account of this meeting:

> I started out by saying, it's not your work. That's not why we're here. We need to talk about how you're behaving and figure something out. And, you know, I explained to him what I thought about his work and how we were all interacting.

> And he said – after that, he said, Can I say my piece? And, you know, I said, Of course. And he opened up by saying, you know, My name is Said. And I said, I know. And he said, I'm Muslim. And I said, I know. And he said, There is discrimination going on across the globe. I said, you know, That's not what's happening here. And he started to talk about praying five times a day and that Allah's name was written on the back of his hand. And if God were to find him untruthful in his statements, may he strike him down. . . .

> And it – I was intimidated because of the conversation we were having and the context of where we were and what we were doing. I wasn't

17

states that Brady's account of what he said is not true. *See* Pl. Resp. SMF ¶ 58. In support of that objection, Plaintiff cites his deposition testimony, in which Plaintiff narrates what happened at the meeting and omits any mention of any such statements, although Plaintiff does not specifically state whether or not he said the things Brady says that he said. In any event, Brady ended the meeting because she felt it was not productive. Def. SMF ¶ 59.

Brady testified that she was concerned with Plaintiff's behavior during the meeting because his statements were completely unrelated to the reprimand they were discussing and were also very grave in nature. Def. SMF ¶ 60. Brady testified:

> Instead of addressing or acknowledging my concerns, [Plaintiff] responded with out-of-context statements that had nothing to do with his unprofessional and insubordinate behavior at the Power Point meeting. I was also disturbed, to the point my stomach was churning, because of the grave statements he made, including that he "loved DCH to death" and that he hoped he would receive his death at home today, or that his home would die today. The references to death were unsettling and startling and I was concerned he might harm himself or others.

---

> concerned by the fact Said is Muslim. I was concerned about the fact that I was trying to have a conversation with him about work and he went, you know, way out into left field. And because his statements were so deep, I found that intimidating.

Brady Dep. 45:8–46:3.

*Id.* (citing Brady Aff. ¶ 36). Plaintiff states again that this account is not true,[10] and cites his deposition testimony apparently as proof that he did not make such statements and therefore that Brady did not have such a reaction. *See* Pl. Resp. SMF ¶ 60. It is undisputed, however, that Brady and Newell went immediately to Human Resources to report what had occurred. Def. SMF ¶ 61.

Plaintiff states that Brady went to Human Resources because he had mentioned religion and discrimination. Pl. SMF ¶ 4. Defendant objects that the cited source does not support the stated fact. Def. Resp. SMF ¶ 4. The excerpt of Brady's deposition testimony that Plaintiff cites in support of his fact reads as follows:

> Q.    And when you spoke with her [Noelle Jones in HR], I think you said about the February 11th meeting you had with Mr. Tlemcani, was there anything else that you told her about the meeting other than what you mentioned earlier?
>
> A.    Well, I gave her the details of the conversation that we had had and the things that Said had said. That's what prompted me to go up to HR because they were scary, not because – you know, having – we don't often talk about religion at work, but I don't have a problem talking about it at all. But the context that we were having it in was scary and his reference to global discrimination when we're talking about a workplace situation was left – total left field, you know. And he mentioned, you

---

[10] Although Plaintiff states that Brady's account of the meeting is not true, Plaintiff affirmatively offers the following statement of fact: "Brady testified that she was scared when [Plaintiff] made a statement to the effect of 'May God strike me down if I am lying.'" Pl. SMF ¶ 3. Defendant does not dispute Plaintiff's stated fact, and states that Brady was concerned with Plaintiff's mention of "death." *See* Def. Resp. SMF ¶ 3.

know, death, like if God finds me untruthful in my statements
may he, you know, strike me down at home or something to that
effect. And that was too much for the situation, I thought, and I
wanted to get guidance on it. It was scary.

Brady Dep. 61:16–62:9.

Brady learned upon returning from Human Resources that Plaintiff had called
his subordinates into his office to discuss the reprimand meeting, which Brady found
to be disruptive and inappropriate. Def. SMF ¶ 62. Newell reported to Brady shortly
thereafter that she was fearful for her safety because one of Newell's direct reports
informed Newell that Plaintiff had stated something to the effect of "Ms. Newell
won't be bullying him anymore." Def. SMF ¶ 63. Newell perceived this as a threat,
and Brady's understanding is that Newell requested a security escort to her car later
that day.[11] *Id.*

Brady informed Commissioner Reese of her concerns, including that Plaintiff
was aggressive and intimidating towards her and Newell during a meeting and that
he made a verbal threat which caused Newell to fear for her safety, to the point that
she was fearful to walk to her car alone. Def. SMF ¶ 64. Plaintiff does not dispute
that Brady told these things to the Commissioner. *See* Pl. Resp. SMF ¶ 64. After

---

[11] The Court again overrules Plaintiff's hearsay objection to Newell's statements,
on the basis of Defendant's representation that such statements are only being
offered to show Brady's state of mind (*i.e.*, what Brady believed had occurred.)

hearing these concerns, Commissioner Reese decided to place Plaintiff on paid administrative leave to remove him from the workplace and diffuse the tension.[12] Def. SMF ¶ 65.

That same day, on February 11, 2016, Plaintiff sent an email to Commissioner Reese. Pl. SMF ¶ 5. Plaintiff states that he sent this email "to report discrimination and retaliation." *Id.* Defendant objects that the cited source does not support the stated fact. *See* Def. Resp. SMF ¶ 5. Plaintiff stated in this email that he was "harassed, belittled, insulted," and that he had "been complaining for so long and no one appears to hear my concerns and calls." *See* Def. Ex. 4, Reese Aff. Ex. A [27-7 at 8] (February 11, 2016 12:02 PM email from Plaintiff to Reese). Plaintiff also stated, "I have a standing case with the Feds in the EEOC and I am waiting on them to launch their investigation." *Id.*

Reese was aware of Plaintiff's previous EEOC charge. Pl. SMF ¶ 6. Reese also testified in his affidavit that he had previously received an email from Plaintiff on January 29, 2016 asking to meet about DCH's "equal employment opportunity conduct" and that Reese had declined to meet until there had been a ruling on

---

[12] According to Brady's affidavit, the decision to place Plaintiff on administrative leave was taken the same day of the meeting between Plaintiff, Newell and Brady, February 11, 2016. Brady Aff. ¶ 41. Brady states that she was present in a subsequent meeting that day in which Plaintiff was informed of his suspension. *Id.*

Plaintiff's pending EEOC/GCEO charge. Reese Aff. ¶ 8. Reese further testified that it was his "standard practice to decline such meetings" and that he "did not meet with employees to discuss pending claims." *See id.*; Def. Resp. SMF ¶ 7.[13]

Reese met with Plaintiff on February 17, 2016 to hear Plaintiff's side of the story as to the recent issues with Brady and Newell, and to get an idea of Plaintiff's demeanor and personality. Def. SMF ¶ 66. The parties dispute the nature of what occurred during Reese's meeting with Plaintiff. According to Reese, within five minutes of the start of the meeting Plaintiff's demeanor changed and he became "agitated, his voice became loud, and he became increasingly argumentative." Def. SMF ¶ 67. Reese testified in his affidavit, "Considering that this was the first time I met [Plaintiff] and he was behaving in such an aggressive manner, it was clear to me what Ms. Brady and Ms. Newell had experienced in supervising [Plaintiff]." Def. SMF ¶ 68. Reese had a "zero-tolerance" policy for aggressive, intimidating, or

---

[13] Plaintiff states that Reese testified that he "did not meet with employees with pending EEOC charges." Pl. SMF ¶ 7. Defendant's objection to this fact is sustained, as Plaintiff misquotes Reese's affidavit. Reese stated that he did not meet with employees "to discuss pending claims." Reese Aff. ¶ 8. Reese did not claim to have had a policy of avoiding all meetings whatsoever (including meetings to discuss things other than the topic of pending EEOC claims) with employees who had pending EEOC charges.

combative behavior, and in his view, "[t]his type of behavior is unacceptable in the workplace and warrants termination." Def. SMF ¶ 69.

Plaintiff disputes Reese's account and cites his own deposition testimony. *See* Pl. Resp. SMF ¶ 67–70 (citing Tlemcani Dep. 98:13–101:19). Plaintiff's account of the meeting with Reese as stated in Plaintiff's deposition is as follows. Plaintiff brought to the meeting a "big file" that included "grievances," and Reese told Plaintiff that Reese did not have time for that. *See* Tlemcani Dep. 98:17–25; *see also* Reese Aff. ¶ 12 (corroborating that Plaintiff brought a thick stack of documents and Reese told Plaintiff that Reese did not want to review them "because the purpose of our meeting was to discuss the circumstances leading up to his administrative leave."). According to Plaintiff, Reese asked Plaintiff if he believed in the "chain of command." Tlemcani Dep. 99:1–2. Plaintiff said yes, but Reese criticized Plaintiff for referring to the employees in Plaintiff's department as "my" employees. *Id.* at 99:2–10. Reese asked Plaintiff, "What happened?" *Id.* at 99:11. Plaintiff stated that he had filed grievances with the OIG against Newell. *Id.* at 11–13. Plaintiff then raised concerns about waste and needing more personnel to combat waste. *Id.* at 99:22–100:20. Plaintiff told Reese that Reese could ask anyone at DCH about Plaintiff's ethics, devotion to the job, and knowledge. *Id.* at 100:21–101:3. Reese asked, "What do you want -- ". *Id.* at 101:15–16. Plaintiff states that Reese's facial

expression conveyed that Reese was "not happy by me bringing up subjects of harassment and intimidation." *Id.* 101:17–19. Lastly, Reese asked Plaintiff "What do you want me to do?" and Plaintiff told Reese "My fate is in your hands." *Id.* at 102:18–21.

Reese decided to terminate Plaintiff's employment. Def. SMF ¶ 70. According to Reese, this decision was "based on the concerns voiced by Ms. Brady and Ms. Newell about [Plaintiff's] intimidating and aggressive behavior, including Ms. Newell's concerns for her safety, which was confirmed by my own personal observations of this same behavior." *Id.* (citing Reese Aff. ¶ 16). Plaintiff does not dispute that Reese's decision was based on representations by Brady and the meeting between Reese and Plaintiff, although Plaintiff disputes that "it was based upon [Plaintiff] acting aggressively" and cites his deposition account of the meeting. *See* Pl. Resp. SMF ¶ 70.

Plaintiff states that Reese swore he was aware of performance concerns with Plaintiff, but that Brady had been clear that she had no performance concerns, only conduct concerns. Pl. SMF ¶¶ 8–9. Defendant objects to Plaintiff's support for these facts. Def. Resp. SMF ¶¶ 8–9. In the affidavit cited by Plaintiff, Reese testified that he was informed of "performance issues" with Plaintiff in his regular meetings with Brady, and that "Ms. Brady reported that Mr. Tlemcani would become aggressive,

combative, and intimidating in his communications and meetings. . . . [and] that Mr. Tlemcani became agitated and belligerent anytime he felt rebuffed or criticized. In addition, Mr. Tlemcani repeatedly steered meeting discussions to topics unrelated to the meeting." Reese Aff. ¶¶ 5–6. Brady, meanwhile, testified in the passage of her deposition cited by Plaintiff that she told Plaintiff "no one was questioning his expertise" but that "[t]he problem that I had and observed with Said was his behavior." Brady Dep. 43:18–23.

Plaintiff was informed of his termination February 29, 2016. Def. SMF ¶ 71. On March 15, 2016, Plaintiff filed a Charge of Discrimination with the EEOC on the basis of race, religion, national origin, and retaliation. Def. SMF ¶ 72. This Charge concerned Plaintiff's termination and does not refer to any other alleged adverse employment actions. *Id.*; *see also* Def. Ex. 1, Tlemcani Dep., Ex. 8 [27-4 at 237] (EEOC Charge dated March 15, 2016). Plaintiff received a Notice of Right to Sue on March 17, 2017. *Id.*

Plaintiff filed his original Complaint [1-3] in this case on March 2, 2017 in the Superior Court of Fulton County, asserting a claim under the Georgia Whistleblower Act that has since been dismissed. Subsequent to receiving his March 17, 2017 Notice of Right to Sue, Plaintiff filed an Amended Complaint in the Fulton

Superior Court, asserting his Title VII claims for the first time, on June 22, 2017. *See* Am. Compl. [4].

## II.   DISCUSSION

### A.   *Summary Judgment Standard*

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and

to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 242. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249; *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

B.     *Motion for Summary Judgment*

In his Amended Complaint, Plaintiff asserts five Counts for relief against Defendant. The District Judge dismissed Count I, a claim under the Georgia Whistleblower Act, on March 22, 2018. *See* Order [32]. Plaintiff asserts Title VII claims in Counts II, III, and IV of the Amended Complaint for discrimination on the basis of race, national origin, and religion, respectively. Am. Compl. ¶¶ 60–80. In Count V, Plaintiff asserts a Title VII claim for retaliation. Am. Compl. ¶¶ 81–89. In each of Counts II through V, Plaintiff asserts that he suffered the specific adverse

actions of harassment, suspension, and termination. Am. Compl. ¶¶ 62–64, 69–71, 76–78.

Defendant moves for summary judgment as to all of Plaintiff's remaining claims. *See* Def. Br. [27-1] at 23.

a.    Preserved Claims

Defendant argues that Plaintiff may not pursue a claim for harassment because he did not raise any such claim in his March 15, 2016 EEOC Charge. *See* Def. Br. at 4. It is undisputed that the only adverse action Plaintiff mentioned in his March 15, 2016 EEOC Charge was his termination.[14] Moreover, Plaintiff does not respond to this argument in his brief. Accordingly, the Court deems any claims based on harassment to be abandoned. *See White v. City of Lagrange, Ga.*, 952 F. Supp. 2d 1353, 1357 (N.D. Ga. 2013) (finding claims abandoned where plaintiff did not respond to defendants' arguments in defendants' motion for summary judgment as

---

[14] As stated above, Plaintiff filed a prior EEOC Charge on September 29, 2015 in which he asserted a claim of discriminatory pay, and a claim of retaliation on the basis of Brady's September 17, 2015 Letter of Concern. *See* Def. SMF ¶¶ 37–38; Def. Ex. 1, Tlemcani Dep., Ex. 10 [27-4 at 239] (Sept. 29, 2015 EEOC Charge). Plaintiff argues that his discriminatory pay is circumstantial evidence of Defendant's discriminatory motive, *see* Pl. Br. [29] at 5–6, and generally claims that he was harassed in retaliation for protected activity. *See* Am. Compl. ¶¶ 31, 86. Plaintiff does not, however, assert any claims in this action on the basis of discriminatory pay, nor does Plaintiff specifically claim that the Letter of Concern was an act of retaliation.

to those claims); *see also Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").[15] Accordingly, Plaintiff has not preserved any claims of discriminatory or retaliatory adverse employment actions other than his termination, and the Court will discuss only Plaintiff's termination in its discussion of his Title VII claims below.

---

[15] Defendant also argues that Plaintiff failed to preserve any claims based on his February 11, 2016 suspension. *See* Def. Br. at 4. Plaintiff does not respond to Defendant's argument that his suspension was not "like or related" to the claims he asserted in his March 15, 2016 EEOC Charge. Instead, Plaintiff argues that his EEOC Charge should be "deemed amended to include the suspension" because Plaintiff raised his suspension in a supplemental letter to the EEOC dated August 18, 2016. Pl. Br. at 2–3, *see also* Pl. Br. Ex. 2 [29-3] at 6 (Plaintiff's August 18, 2016 letter). Plaintiff did not, however, mention his suspension in this letter. Thus, even if this supplemental letter had been a valid manner of asserting the suspension claim, it would not suffice, and it appears Plaintiff has abandoned any argument that his suspension was "like or related" to the termination claim he asserted in his March 15, 2016 EEOC Charge.

Whether Plaintiff has preserved any claim relating specifically to his suspension or not is ultimately moot. As discussed below, the Court finds that Plaintiff has produced insufficient evidence to support a viable claim of discriminatory termination. The Court sees no reason why the analysis below would be different if Plaintiff's claim of discriminatory suspension were included, as Plaintiff's termination was essentially the culmination of the same course of events that first led to Plaintiff's suspension, which occurred just a few days before.

2.      Discrimination Under Title VII

Plaintiff asserts in Counts II–IV of his Amended Complaint that his February 29, 2016 termination constituted discrimination on the basis of his race (Arab-Moorish), his religion (Muslim), and his national origin (Moroccan). Am. Compl. ¶¶ 60–80.

a.      Standards of Proof Under Title VII

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a Title VII claim, a plaintiff must prove that the defendant acted with discriminatory intent. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980–81 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). Such discriminatory intent may be established either by direct evidence or by circumstantial evidence meeting the four-pronged test set out for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Holifield v. Reno*, 115

F.3d 1555, 1561-62 (11th Cir. 1997); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984).

Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *Evidence, Black's Law Dictionary* 596 (8th ed. 2004); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993); *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir. 1989); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence. *Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 581. Evidence that only suggests discrimination, *see Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, *see Harris v. Shelby Cty. Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence. "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641–42 (11th Cir. 1998).

Evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. *Earley v.*

*Champion Int'l Corp.*, 907 F.2d 1077, 1081–82 (11th Cir. 1990). Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent, using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527–28 (11th Cir. 1997). Under this framework, a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *see also Jones v. Bessemer Carraway Medical Ctr.*, 137 F.3d 1306, 1310, *reh'g denied and opinion superseded in part*, 151 F.3d 1321 (11th Cir. 1998); *Combs*, 106 F.3d at 1527.

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Jones*, 137 F.3d at 1310–11; *Holifield*, 115 F.3d at 1562; *see Burdine*, 450 U.S. at 253–54. Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Jones*, 137 F.3d at 1310. If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail,

must then show that the proffered reason is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253–54; *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

A plaintiff is entitled to survive a defendant's motion for summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of material fact regarding the truth of the employer's proffered reasons for its actions. *Combs*, 106 F.3d at 1529. A *prima facie* case along with sufficient evidence to reject the employer's explanation is all that is needed to permit a finding of intentional discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Combs*, 106 F.3d at 1529.

This *McDonnell Douglas-Burdine* proof structure "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix v. WLCY Radio/Rahall*

34

*Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984). Indeed, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff may also defeat a motion for summary judgment by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted). The "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Nix*, 738 F.2d at 1184 (quoting *Aikens*, 460 U.S. at 713–14); *see also Jones*, 137 F.3d at 1313. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Burdine*, 450 U.S. at 253.

b.      Racial, Religious, and National-Origin Discrimination

(1)      Plaintiff's *Prima Facie* Case

Plaintiff does not contend that he has produced direct evidence of any discriminatory intent, and the undersigned finds that he has not done so. Thus, Plaintiff's claims of racial, religious, and national-origin discrimination rest purely on circumstantial evidence. Under the *McDonnell Douglas-Burdine* framework, a

plaintiff can generally establish a *prima facie* case of unlawful discrimination under Title VII by showing that: 1) he is a member of a protected class;[16] 2) he was subjected to an adverse employment action by his employer; 3) he was qualified to do the job in question, and 4) his employer treated similarly situated employees outside his protected classification (*i.e.*, those of a different race) more favorably than it treated him. *See McDonnell Douglas*, 411 U.S. at 802; *see also Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Plaintiff does not, however, argue that Defendant treated any similarly situated employees outside his protected classifications more favorably, and therefore does not argue that he has met the *prima facie* case under the *McDonnell Douglas* framework. Instead, Plaintiff argues that under the alternative framework of *Smith v. Lockheed-Martin*, he has created a "convincing

---

[16] Although courts continue to include the requirement that a plaintiff establish as part of a *prima facie* case that he or she is a member of a "protected class," it is clear that individuals of any sex, race, or religion may pursue claims of employment discrimination under Title VII. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1290 n.3 (11th Cir. 1999) (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278–80 (1976)). Thus, the key element of a plaintiff's *prima facie* case requires him to establish that similarly situated persons outside of his protected classification (*i.e.*, those of a different race) were treated more favorably by the employer. *See Wright*, 187 F.3d at 1290 n.3.

mosaic of circumstantial evidence" sufficient to establish an inference of discriminatory intent.

In support, Plaintiff points to the following four matters. First, Plaintiff states that the OIG report on his internal discrimination claim shows that Plaintiff was underpaid in relation to six other MG1 Business Ops employees. Pl. Br. at 5. Second, Plaintiff states he has produced evidence of the mocking of his name by Burris, the HR Director. *Id.* at 6. Third, Plaintiff states that Brady knew he was Muslim, and told HR that he was Muslim, and that Brady was scared by Plaintiff's statement to her that "May God strike me down if I am lying" or words to that effect. *See id.* at 6–7. Fourth, Plaintiff states that Reese, who made the decision to terminate Plaintiff, was motivated by what Brady had told Reese. *See id.* at 7.

Defendant, on the other hand, argues that the Plaintiff fails to show a "convincing mosaic of circumstantial evidence" and that therefore Plaintiff has failed to establish a *prima facie* case of racial, religious, or national-origin discrimination as a matter of law. *See* Def. Reply Br. at 5–8. The Court agrees.

With respect to Plaintiff's first argument, despite Plaintiff's references to his original complaints and EEOC charge on the subject of his alleged underpayment, this lawsuit does not actually include a claim for discriminatory pay. Rather, this lawsuit is about Plaintiff's termination and related events. Plaintiff appears to

reference his prior complaints about pay as part of his overall "mosaic" of evidence to suggest that his termination was discriminatory. But Plaintiff does not show how his alleged "underpayment" in relation to other OFM employees who like him were designated as MG1 Business Ops, has any bearing on race, religion, or national origin. Plaintiff does not provide evidence of any of these individuals' religions, races or national origins, much less that these other persons had the similar qualifications, years of experience, or responsibilities. Plaintiff provides no indication of how these salary decisions were made, or by whom, or any evidence suggesting discrimination on the part of whomever made such decisions. Plaintiff's perception of disparate pay therefore offers no proof to support his claim of discriminatory termination.

Plaintiff's second argument, and indeed much of Plaintiff's claim of discrimination, appears to be based on the mispronunciation of his name. According to Plaintiff, when Plaintiff talked to Burris, she mispronounced his first name and then continued to do so after being corrected. Because Burris had been corrected, the Court assumes for purposes of resolving this motion that she purposefully continued to mispronounce Plaintiff's name, perhaps for purposes of insulting him. But the evidence is simply not enough for this to suggest that Plaintiff's termination was based on discrimination.

Merely mispronouncing a name is hardly direct evidence of any intention to make discriminatory employment decisions, much less on any particular basis. Moreover, these mispronunciations did not occur in any discussion of the actual employment decision at issue, and were not by the ultimate decision-maker (Reese). The Eleventh Circuit has found isolated stray remarks far more derogatory than a mispronunciation of a name to be insufficient to create an issue of fact as to discriminatory intent. *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1267–68 (11th Cir. 2010) (general derogatory, anti-Cuban-American statements by company president, who was involved in termination of Cuban-American plaintiff but who was not the principal decision-maker, including that "Cubans are dumb," was "too weak to raise a general fact issue" as to whether plaintiff was terminated on the basis of national origin); *Rojas v. Florida*, 285 F.3d 1339, 1342–43 (11th Cir. 2002) (statement by female plaintiff's supervisor, who was the principal decision-maker as to plaintiff's termination, that another former female employee did not deserve her job "because [she] was a woman," was, in itself, insufficient to establish discriminatory intent as to the plaintiff's termination). Furthermore, while the Court assumes that Plaintiff's name would have been obviously ethnic in nature to Burris, there is no evidence to conclude that Burris necessarily associated Plaintiff's name with any particular religion or race. Thus, the evidence does not combine in any

"mosaic" with other statements Plaintiff adduces from other individuals, discussed below, which at most relate specifically to religion.[17]

In his third and fourth contentions, Plaintiff relies on his conversations with Brady, in which Brady became scared and then reported him, and claims that Reese was motivated to fire him by what Brady told Reese. Plaintiff argues that a jury could infer that he was terminated based on religion, because Brady reported Plaintiff to HR and Reese, and Reese then suspended him that afternoon, immediately after a heated meeting with Brady in which Plaintiff talked about God, death, and being Muslim. *See* Pl. Br. at 6–7.

Notably, however, neither Brady nor Reese brought up religion, God, or Islam in any of these conversations. They focused these disciplinary meetings with Defendant on his attitude and hostility toward supervisor criticism. The undisputed facts suggest that it was Defendant who, out of the blue, brought up his religion, and made specific references to death, in a seemingly unconnected response to this

---

[17] Plaintiff also states that he has evidence that Newell mocked his name, but as stated above, the Court sustains Defendant's objection to Plaintiff's Statement of Fact ¶ 2 (in which he makes this claim) with respect to Newell, as unsupported by the cited evidence. Thus, the Court disregards Plaintiff's argument that Newell mocked his name and that such mockery is circumstantial evidence of discrimination. In any event, even if this assertion of fact were considered, it would not change the undersigned's recommendation for the reasons stated above.

discipline. That Defendant himself brought up religion in an apparently self-serving manner, in response to pre-existing accusations of unrelated workplace misconduct, does not suggest discrimination. Indeed, that he was already facing this scrutiny and criticism for the perceived misconduct that ultimately led to his suspension and termination—prior to ever referencing his religion—appears to refute the notion that he was terminated because of religion.[18]

Finally, the termination decision was made by Reese, not Brady or Burris. While Reese considered the information provided by Brady, he did not make the decision until he personally met with Plaintiff and concluded for himself that Plaintiff's response to having his behavior questioned was inappropriate and aggressive. Plaintiff adduces no evidence as to Reese' discriminatory mindset.

---

[18] Brady states that she was made uncomfortable by Plaintiff's references to death and God "strik[ing] him down," but not specifically because these statements involved religion. Rather, she considered these references to violence to be upsetting in the context of a workplace disciplinary discussion, and because these comments were a complete *non sequitur*. The Court does not find that Brady's comments show discrimination on the grounds of religion. Plaintiff adduces no proof that Brady or Reese would have considered similar statements to be more appropriate if stated by an employee of a different religion, or who followed no religion. In any event, these statements were just part of the overall mix of perceived hostile and inappropriate conduct that led to the series of meetings that culminated in Plaintiff's termination, most of which pre-dated his spontaneous and self-serving references to religion.

These facts are therefore significantly different from those that the Courts have found to support a "convincing mosaic" of evidence of discrimination. In *Smith*, for example, the plaintiff-appellant, Anthony Mitten, was a white supervisory employee who was fired for forwarding a "racially insensitive 'joke' email." *See Smith*, 644 F.3d at 1324. Mitten sued Lockheed for discriminating against him based on his race by terminating his employment. *Id.* at 1323. Mitten could not point to a comparator, as there was no non-white supervisory employee who was not fired for the same conduct. *Id.* at 1326–27. The district court granted summary judgment to Lockheed on the basis that Mitten had failed to identify a comparator, but the Eleventh Circuit reversed. *Id.* The Eleventh Circuit held that the *McDonnell Douglas* framework was not the only valid means by which a plaintiff could survive summary judgment, and that a "triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* at 1327 (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011)).

The circumstances surrounding Mitten's termination in *Smith* included that, two years prior, a white employee of Lockheed had committed a mass shooting at the company's plant in Meridian, Mississippi, and the incident was considered by many to be a hate crime against blacks. *See id.* at 1329. Numerous lawsuits from

victims and their families—and later, from the EEOC—accused Lockheed of having known about, and failing to act in response to, the shooter's racial harassment of his black coworkers, and more broadly of tolerating a work environment in Meridian that was hostile to blacks. *See id.* at 1329–30. Lockheed learned that ABC News was planning to televise a report commemorating the shooting. *See id.* at 1330.

Meanwhile, multiple incidents had occurred in which employees transmitted racist emails, and multiple employees were fired for violating the company "zero-tolerance" policy against transmitting ethnic slurs or racial comments. *See id.* at 1323–24. The Eleventh Circuit found that three principal circumstantial facts precluded granting summary judgment for Lockheed. *See id.* at 1341. First, certain white non-supervisory employees were fired for racist emails but black non-supervisory employees had received lesser sanctions for the same offense. *Id.* at 1341–43. Second, the context of the ABC News report and the lawsuits accusing Lockheed of racism against blacks arguably gave Lockheed a greater incentive to fire white employees who engaged in racist misconduct than blacks. *Id.* at 1344. Third, a "matrix" that Lockheed used to make its termination decision explicitly noted Mitten's race, implying that race was injected into the discipline decision. *Id.* at 1345–46. In sum, the "totality" of the circumstances in the record contained

sufficient substantial evidence from which a jury could infer that Lockheed had a racially discriminatory animus when it fired Mitten. *Id.* at 1346–47.

In this case, Plaintiff does not point to any sort of contextual evidence about the atmosphere at DCH, or discriminatory acts against others, or anything otherwise remotely of the quality of evidence as presented in *Smith*. Instead, Plaintiff focuses on a narrow set of events anecdotal to him, including the HR Director's (Burris's) mispronunciation of his name, and the fact that *he himself* brought up religion during a disciplinary meeting with a supervisor (Brady). These facts are simply insufficient to show even a *prima facie* case that he was terminated based on any protected characteristic, particularly where that decision was made by yet another supervisor (Reese).[19] Accordingly, the Court **RECOMMENDS** that the Motion for Summary

_____

[19] The Court appreciates that Plaintiff appears to dispute the version put forward by Defendant's witnesses as to what happened in the meetings that led up to his suspension and termination, and specifically as to whether Plaintiff was yelling or otherwise being aggressive and insubordinate. Much of these arguments go to the question of pretext. In other words, Plaintiff argues that there is a material dispute of fact as to whether he was terminated for the reasons that Defendant proffers, that is, for exhibiting insubordinate and otherwise hostile behavior. The Court only reaches the question of pretext, however, if Plaintiff adduces evidence to show a *prima facie* case suggesting the existence of discrimination. For the reasons stated above, the Court finds that Plaintiff has not done so. A disagreement between Plaintiff and his supervisors as to his tone and attitude in these meetings does not in itself constitute evidence of discrimination.

Moreover, although the issue is a closer one, the Court also finds in the alternative that, even if Plaintiff had established a *prima facie* case, he nevertheless fails to

Judgment be **GRANTED** with respect to Plaintiff's Title VII claims of racial, religious, and national-origin discrimination asserted in Counts II, III, and IV of the Amended Complaint.

### 3. Title VII Retaliation Claim

#### a. Legal Standards

Proof of retaliation is governed by the framework of shifting evidentiary burdens established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

---

demonstrate that Reese's reasons for terminating him were pretextual. Reese states that he made the decision "based on the concerns voiced by Ms. Brady and Ms. Newell about [Plaintiff's] intimidating and aggressive behavior, including Ms. Newell's concerns for her safety, which was confirmed by my own personal observations of this same behavior." Def. SMF ¶ 70 (citing Reese Aff. ¶ 16). Although Plaintiff does not perceive that he engaged in an intimidating and aggressive tone with Newell and Brady, he does not dispute that Newell and Brady reported that he had done so to Reese, and that Reese was told that Newell had even voiced concerns for her safety, apparently based on what Plaintiff reportedly said to one of Newell's subordinates. More importantly, although Plaintiff appears to dispute some of what was said in the February 17, 2016 meeting with Reese, Plaintiff cites no evidence to refute Reese's assertion that he (Reese) personally concluded that Plaintiff was exhibiting an intimidating and aggressive tone and behavior. Where it is, essentially, undisputed, that the decision-maker, who is not alleged to be biased, made his employment decision based substantially on his own personal observations and interactions with Plaintiff, and where it is undisputed that the decision-maker believed that other employees made complaints of physical safety *vis-à-vis* Plaintiff, the Court finds that Plaintiff has not shown significantly probative evidence of pretext.

*Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir. 1986); *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162–63 (11th Cir. 1993). In order to prevail, a plaintiff must first establish a *prima facie* case of retaliation. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–01; *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden Cty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).

Once a *prima facie* case has been established, the employer must come forward with a legitimate non-discriminatory reason for its action. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–01; *see also Weaver*, 922 F.2d at 1525–1526. If the employer carries its burden of production to show a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–01.

To establish a *prima facie* case of illegal retaliation under Title VII, a plaintiff must generally show that: (1) he engaged in a protected activity or expression; (2) he received an adverse employment action, and (3) there was a causal link between the protected expression and the adverse action. *See, e.g., Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d

1515, 1524 (11th Cir. 1991); *Simmons v. Camden Cty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).

          b.     Plaintiff's Retaliation Claim

Plaintiff asserts in his Amended Complaint that the following matters were protected expressions under Title VII: a report he filed in June 2015 with HR about his previous supervisor Connell, *see* Def. SMF ¶ 8; his 2015 EEOC Charge; and his February 3, 2016 grievance against Newell. *See* Am. Compl. ¶¶ 82–85. Plaintiff claims that he suffered the adverse action of termination in retaliation for having engaged in those acts of protected expression.

Defendant does not dispute that Plaintiff's termination constitutes an adverse employment action. *See* Def. Br. at 16. Defendant argues, however, that the February 2016 grievance was not protected expression because Plaintiff did not complain about discrimination and did not assert that he was discriminated against based on any protected characteristic. *See id.* at 15 n.6. Defendant also argues that the September 2015 EEOC Charge, and the June 2015 complaint to OIG, occurred over four and eight months prior to Plaintiff's termination, respectively, and that those time intervals are too long to support an inference of causation between the protected activity and the adverse action. *See* Def. Br. at 16.

Plaintiff does not refute Defendant's argument that the June 2015 and September 2015 activities occurred too long before his February 29, 2016 termination to support such an inference, and Plaintiff does not argue that he has any evidence of causation between those activities and his termination aside from the timing alone. *See* Pl. Br. at 8. Plaintiff thus abandons any claims of retaliation based on the June 2015 OIG complaint and the September 2015 EEOC Charge. *See White*, 952 F. Supp. 2d at 1357; *Hudson*, 209 F. Supp. 2d at 1324. Plaintiff also does not respond to Defendant's argument that the February 4, 2016 grievance against Newell was not protected activity. He therefore abandons any retaliation claim premised on that grievance, for the same reason. *See id.*

Plaintiff argues in his brief, however, that other events in February 2016 were protected expression, and that as the intervening period was only at most 18 days, an inference of causality may be supported from the timing of the events *vis-à-vis* his termination alone. Plaintiff contends that the following acts were protected expression: (1) his February 11, 2016 mention of religion and discrimination to Brady; (2) his email that same day to Reese, which Plaintiff characterizes as an email "to report discrimination and retaliation," and (3) Plaintiff's meeting with Reese on February 17, 2016 in which Plaintiff says that he "informed Reese that he had an

EEOC charge pending and felt discrimination and retaliation were occurring." *See* Pl. Br. at 8.

(1)    Protected Expression

A plaintiff alleging unlawful retaliation can show that he engaged in a protected act under Title VII through evidence of either "participation" or "opposition." *See* 42 U.S.C. § 2000e-3(a). An act of participation requires the existence of a Title VII proceeding or investigation. *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000); *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999). The filing of a charge of discrimination with the EEOC generally meets the standard of a protected activity. *See, e.g., Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir. 1993). In this case, Plaintiff has abandoned any retaliation claim based on the protected "participation" of his September 2015 EEOC Charge.

Plaintiff's theory is instead that he was retaliated against for "opposition," that is, for making informal complaints at work opposing illegal discrimination. *See Rollins v. Fla. Dep't. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) ("[W]e recognize that the protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those, like [the

plaintiff], who informally voice complaints to their superiors or who use their employers' internal grievance procedures.").

For an employee to be protected under the anti-retaliation provisions of Title VII, he must oppose conduct that is made an "unlawful employment practice" by Title VII. Title VII defines an "unlawful employment practice" as, *inter alia*, discrimination against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In other words, it is not enough for a plaintiff to show that he opposed garden-variety unfairness or harsh treatment in the workplace; he is only protected from retaliation if the practice he opposed or complained about is specifically prohibited by Title VII.

To recover under a theory of retaliation, a plaintiff need not *prove* the underlying claim of discrimination that led to the complaint, so long as he had a "good faith, reasonable belief" that the conduct or practice he was opposing constituted unlawful discrimination. *Clover*, 176 F.3d at 1351; *Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999); *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989). The reasonableness of the plaintiff's belief is measured against the law as it existed at the time of the protected activity; thus, the plaintiff is charged with knowledge of the parameters of what Title VII does and

does not prohibit. *Clover*, 176 F.3d at 1351; *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 n.2 (11th Cir. 1998); *Little v. United Techs.*, 103 F.3d 956, 960 (11th Cir. 1997).

Defendant argues that none of the three events that Plaintiff points to in his brief count as protected "opposition" because there is no evidence that Plaintiff opposed conduct made unlawful by Title VII. *See* Def. Reply Br. at 9. Defendant acknowledges that Plaintiff used terms such as "harassment," but Defendant argues that there is no evidence Plaintiff ever stated that he was being harassed based on a protected characteristic such as his race, religion, or national origin. The Court agrees.

First, Plaintiff's meeting with Brady and Newell on February 11, 2016 does not constitute protected "opposition." There is support in the record that Plaintiff talked about God, global discrimination against Muslims, being Muslim, and having an Arab name in this meeting. *See* Brady Dep. 45:8–46:3; Tlemcani Dep. 91:3–92:11.[20] However, mentioning one's race or religion is not the same as *opposing*

---

[20] Plaintiff's account of this meeting is stated in relevant part below:

> A. I remember she was sort of very, very aggressive, and by "she" I mean Elizabeth Brady, because she did most of the talking, as I said, about 95 percent of the time. And she was yelling and screaming and calling my name, "Said," [pronounced Sayid], "keep your mouth shut. You're not supposed to talk about waste again."

*racial or religious discrimination*. Nowhere in Brady or in Plaintiff's deposition testimony, the parties' statements of fact, or otherwise, is there any evidence of any specific complaint about discriminatory conduct that Plaintiff made to Brady in this meeting.

The next statement at issue is Plaintiff's February 11, 2016 email to Reese, which apparently refers to what happened in the meeting with Brady and Newell

---

> And then when she started screaming my name I said, "Hey, you don't have to mention my name several times. I know I've been profiled before. And I know Said is an Arab name," from somewhere Arab, whatever. And I said, "That's why I went to file my grievances."
>
> And she said something like -- when I said that Timothy Connell had profiled me before and stuff like that, she said, "Hey, listen, that's normal. In the workplace we ask people where they're from, what religion they -- That's completely normal. What do you expect?"
>
> I said, "Ms. Brady, you know that I have a charge with the EEOC. You know that, a charge especially against you." She said, "I don't care. And guess what? DCH has beaten cases like that before. We're not scared of the EEOC or anything, and you're not going to happy."
>
> Q. Ms. Brady said this?
>
> A. Yes. And then I said, "Ma'am, Ms. Brady, what I'm saying is that I have an EEOC charge. The Commissioner, Mr. Clyde Reese knows about it. The Inspector General must know about it. Ann Burris must know about it. It's just standard protocol." She said, "I don't care." And then she stood up and said, "Get the hell out of my office. Get out." I backed up and left.

Tlemcani Dep. 91:3–92:11.

earlier that day. This email, which contains the subject line "Continuing Grievances

(DCH)," states as follows:

> Mr. Reese,
>
> Both Liz B. and Angie Newell have brought me into Liz's office and closed me in. I was harassed, belittled, insulted, and I have been complaining for so long and no one appears to hear my concerns and calls. I have a standing case with the Feds in the EEOC and I am waiting on them to launch their investigation.
>
> Many managers have complained about Angie and her lack of knowledge and lack of ethical behavior. Liz has been siding with her and she wanted me to sign another write-up. My records are clean and they must speak for me. I am pleading with you, Mr. Reese, to intervene and sit down with me as soon as you can. I have a long list of witnesses.
>
> Thank you kindly.

Reese Aff., Ex. A [27-7 at 8].

The Court agrees with Defendant that this email does not, in itself, constitute

protected activity. To be sure, Plaintiff refers in this email to his pre-existing EEOC

claims. It is undisputed, however, that Reese was already aware of this long-standing

complaint, which had been pending for several months before Plaintiff was

terminated. Plaintiff's reference to this pending case is therefore not "new" protected

activity. And the timing of Reese's decision to terminate Plaintiff—a few days after

Plaintiff simply referred to an old, long-pending EEOC complaint about which

Reese already was aware—does not itself suggest an intent to retaliate.

Plaintiff otherwise makes non-specific claims of mistreatment, unethical conduct, and "lack of knowledge" by her supervisors. But such generalized complaints about workplace mistreatment, not specifically related to characteristics protected by Title VII, do not give rise to an actionable claim for retaliation.[21] Plaintiff's February 11 email does not specifically allege any new acts of discrimination on the grounds of race, religion or nationality. While he refers to this pending EEOC claim, Plaintiff does not state that his current complaints are of a similar nature, much less how. Indeed, they were not of a similar nature, as Plaintiff's EEOC complaint was about his salary, *see* Tlemcani Dep., Ex. 10 [27-4 at 239] (September 29, 2015 EEOC Charge), not about a harassing or belittling tone by supervisors. Thus, at most, the email simply states that he feels mistreated generally, and that he has made various complaints over time that have been ignored, including

---

[21] *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301–02 (11th Cir. 2007) ("Title VII does not prohibit . . . harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category such as sex."); *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) ("A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination.") (quoting EEOC Compliance Man. (CCH) §§ 8-II-B(2) (2006)).

a pending EEOC complaint. This is not sufficient to establish any new protected activity under the auspices of Title VII.

In any event, it is undisputed that Plaintiff sent this email after having been repeatedly criticized for inappropriate conduct and having received a written reprimand from Brady. Courts have recognized that "evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *Smith v. Memorial Hosp. Corp.*, 302 F.3d 827, 834 (8th Cir. 2002).[22]

Finally, for much the same reasons, Plaintiff also did not engage in Title VII protected activity in his February 17, 2016 meeting with Reese. According to Plaintiff's brief, he "informed Reese that he had an EEOC charge pending and felt

---

[22] *See also Pipkins v. City of Temple Terrace, Fla.,* 267 F.3d 1197, 1201 (11th Cir. 2001) (where continuing negative performance evaluations had commenced prior to any protected expression, plaintiff could not prove element of causation simply through timing); *Pirie v. The Conley Group, Inc.,* No. 4:02-CV-40578, 2004 WL 180259, at **18–19 (S.D. Iowa 2004) (subsequent discipline for deficiencies written up prior to protected activity could not reasonably be found to be caused by protected activity); *Smith v. Ashland, Inc.,* 250 F.3d 1167, 1174 (8th Cir. 2001) (where employee's deficiencies were well documented prior to protected activity, temporal proximity does not support inference of retaliation); *Padob v. Entex Info. Serv.,* 960 F. Supp. 806, 814 (S.D.N.Y. 1997) (where employee had already been informed that she had been placed on a PIP and that a decision as to her continued employment might be made, her termination although close in proximity to her protected activity did not, standing alone, establish the necessary causal connection between the protected activity and her discharge).

discrimination and retaliation were occurring." Pl. Br. at 8 (citing Tlemcani Dep. 98:13–101:19). The brief is not evidence, however, and the cited deposition testimony does not support that characterization at all. Plaintiff did not testify that he discussed his EEOC charge in this meeting. At most, Plaintiff testified that he told Reese he had filed a few OIG grievances against Newell. *See* Tlemcani Dep. 99:13. But Plaintiff did not testify in any passages cited to the Court that he talked to Reese about religion, race, national origin, or discrimination. Instead, Plaintiff testified that he told Reese about "harassment," "unethical conduct or chronic harassment or intimidation," "waste," "personnel," and "Waste, waste, we need personnel." *Id.* at 99:15–100:7. As noted above, these generalized complaints are not protected by Title VII. Moreover, even if Plaintiff had referred to his pending EEOC complaint in this meeting, for all the reasons discussed above, that reference would not be sufficient to allow an inference of retaliation.[23]

Plaintiff therefore fails to make out the element of his *prima facie* case for retaliation that requires him to show that he engaged in protected expression. Accordingly, the Court **RECOMMENDS** that the Motion for Summary Judgment

---

[23] Also, Plaintiff had already been reprimanded and suspended by the time of the February 17 meeting. As explained above, this chronology undercuts any inference of causation that might otherwise be associated with Plaintiff having referred to discrimination during this meeting.

be **GRANTED** with respect to Plaintiff's claim of retaliation in Count V of the Amended Complaint.

### III.    CONCLUSION AND RECOMMENDATION

For the reasons discussed above, **IT IS RECOMMENDED** that the Motion for Summary Judgment [27] be **GRANTED**.

As this is a Final Report and Recommendation, there is nothing further in this action pending before the undersigned. Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED** this 15th day of June, 2018.

_____

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE